# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**DOUGLAS COUNTER**,

               Plaintiff,

     v.

**COMMISSIONER OF SOCIAL SECURITY**,

               Defendant.

Case No. 1:13 CV 1511

Magistrate Judge James R. Knepp II

MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Douglas Counter seeks judicial review of Defendant Commissioner's decision to deny disability insurance benefits (DIB). (Doc. 1). The district court has jurisdiction under 42 U.S.C. § 405(g). The parties consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 20). For the reasons below, the Court affirms in part and remands in part the Commissioner's decision denying benefits.

## PROCEDURAL BACKGROUND

Plaintiff filed an application for DIB on February 16, 2010, alleging a disability onset date of October 28, 2007, due to an organic mental disorder and visual disturbances. (Tr. 21, 124, 184, 217). Plaintiff's date last insured is March 31, 2010. (Tr. 217). His claim was denied initially (Tr. 123, 127-130) and on reconsideration (Tr. 124, 134-39). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 140). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (*See* Tr. 17, 34).  The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981. On July 12, 2013, Plaintiff filed the instant case. (Doc. 1).

Prior to the instant case, Plaintiff filed DIB and supplemental security income (SSI) applications on February 12, 2004, alleging a disability onset date of November 20, 2003. (Tr. 20). After an October 18, 2005 hearing, an ALJ found Plaintiff was not disabled. (Tr. 20). However, that decision was remanded by the Appeals Council for further proceedings. (Tr. 20). In the meantime, Plaintiff filed additional DIB and SSI applications. (Tr. 20, 121-22). The Appeals Council treated these new applications and Plaintiff's February 12, 2004 applications as duplicates and ordered the Social Security Administration (SSA) to consolidate all outstanding issues. (Tr. 20). On October 16, 2007, another ALJ convened a hearing and issued a decision finding Plaintiff not disabled. (Tr. 20). Plaintiff did not appeal that decision. (Tr. 20).

The prior decision is relevant because the ALJ in the instant case declined to follow the *Drummond* ruling, which is a Sixth Circuit *res judicata* rule requiring an ALJ to adopt the RFC finding in a prior decision absent a change of circumstance shown by new or material evidence. *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997); *see also* Acquiescence Ruling 98-4(6). Here, the ALJ found *Drummond* did not apply because new and material evidence existed. (Tr. 21). Specifically, Plaintiff's new diagnosis of attention deficit hyperactivity disorder (ADHD). (Tr. 21).

### FACTUAL BACKGROUND
**Personal and Vocational History**

Born April 1, 1977, Plaintiff was 32 years old on his date last insured. (Tr. 184). He graduated high school and has past work experience as a laborer, drill press operator, and temporary agency worker. (Tr. 40-41). He last worked two years prior to the ALJ hearing as a laborer but was fired because he "got into it" with a coworker. (Tr. 41, 64).

In 2009, Plaintiff and his wife were evicted from their home due to "health hazards" and Plaintiff never showed up to court to contest the eviction. (Tr. 78, 304). According to Plaintiff,

he and his wife were hoarders and their house was unsafe. (Tr. 61-63). Indeed, in 2009, Plaintiff and his wife lost custody of their children due to "neglect" and an "unsafe living environment." (Tr. 350). Moreover, a case worker described Plaintiff and his wife as "consummate hoarders" who saw "no problem with this way of life." (Tr. 350). In a function report in 2010, Plaintiff said he lived at his mother's house where he took care of his kids. (Tr. 241-42). However, he later testified he and his wife were living in a homeless shelter but occasionally slept in his car and showered at a friend's house. (Tr. 77). At the time of the hearing, his mother had custody of two children and his sister one child. (Tr. 59-61).

Plaintiff's counsel questioned Plaintiff at length during the hearing regarding an altercation that took place in October 2010. (Tr. 46-58). Indeed, Plaintiff was arrested for menacing, where he said he "retaliated" against a woman who initiated an altercation between Plaintiff and her brother. (Tr. 46-58, 342). In sum, Plaintiff threatened a woman in a park after a free community meal and was arrested. (Tr. 342). He pled no contest and paid a filing fee. (Tr. 76).

Concerning activities of daily living, Plaintiff reported he attended to personal care, prepared frozen meals or sandwiches, cleaned the bathroom, washed dishes, mowed the lawn, drove, shopped for his family, played basketball and video games, attended sporting events, and attended "hot meals" in the park. (Tr. 242-45, 250-56, 362-63). He was capable of paying bills, counting change, handling a savings account, and using checks or money orders. (Tr. 244, 253). Plaintiff reported anger affected completing tasks, following instructions, and concentration. (Tr. 246).

**Medical Records**

As the Commissioner points out, the record contains no evidence of treatment during the relevant period – between his alleged onset date (October 28, 2007) and date last insured (March 31, 2010). (Tr. 201, 217).

Plaintiff saw consultive examiner Mitchell Wax, M.D., on April 23, 2007, as part of his prior disability application and prior to the alleged onset date in the case at bar. (Tr. 360-68). At this time, Plaintiff lived with his wife, who received social security disability, and one-year-old child in subsidized housing. (Tr. 360). Plaintiff said "being slow" and problems with his eye prevented him from working. (Tr. 360). Plaintiff reported "no prior psychiatric hospitalizations and no prior psychiatric care." (Tr. 361). On examination, Dr. Wax noted Plaintiff was a "pleasant well-developed intellectually limited man." (Tr. 361). "Intermittent mental drifting was noted, and low intelligence [was] suspected." (Tr. 361).

Dr. Wax reported Plaintiff exhibited a borderline range of intelligence, with marginal coherence, a blunted affect, and an intermittent ability to concentrate. (Tr. 361-62). Plaintiff had good motivation, no mental confusion, and no abnormal psychomotor activity. (Tr. 361-62). Dr. Wax administered a Wechsler Adult Intelligence Scale (WAIS)-III test, which revealed a verbal IQ of 66, performance IQ of 69, and full scale IQ of 64. (Tr. 366). However, Dr. Wax conditioned the scores by stating, "[t]his test is valid but should be interpreted with caution as this individual appeared to be functioning at a higher level than test results indicate." (Tr. 363).

Dr. Wax found Plaintiff was markedly impaired in his abilities to maintain concentration, persistence, and pace; relate to others; understand, remember, and follow instructions; and withstand stresses and pressures associated with day to day work activities. (Tr. 364-65). Dr. Wax diagnosed intermittent explosive disorder, personality disorder with antisocial features,

4

borderline intellectual functioning, and learning disorder, and assigned a global assessment of functioning (GAF) score of 48.[1] (Tr. 365).

On September 14, 2010, six months after the date last insured, Plaintiff saw consultive examiner Ronald Smith, Ph.D. (Tr. 379-84). Plaintiff drove himself to the examination and said "he had no trouble driving his car." (Tr. 379). Plaintiff said he and his wife were homeless – they lived in shelters during the winter and their car during the summer – and his children were living with his mother. (Tr. 379-80). He said they had an apartment but were evicted due to poor housekeeping. (Tr. 380). "He admitted that he 'screwed up' and would have been able to stay if he [had] gone to court." (Tr. 380). Plaintiff reported reading instruction books and car magazines and was able to "multiply and add four and five and he could divide 30 by 6." (Tr. 380). He had a checking account and wrote checks to pay the phone bill. (Tr. 380). "His wife gets a Social Security check which is direct deposited into their account." (Tr. 380).

Plaintiff reported having two permanent and a few temporary jobs. (Tr. 380). The first was with a plastics company where he was fired for "sleeping on the job." (Tr. 380). His second job was for Stud Welding but he was laid off. (Tr. 380). His last temporary job was in 2008 stacking magazines where he was fired for "not doing it right." (Tr. 380).

On examination, Plaintiff was cooperative but "listless in his manner." (Tr. 381). "His responses were direct and [to] the point and his thinking seemed well organized." (Tr. 381). He had a good range of affect and showed appropriate affective expression. (Tr. 381). "He was alert and in good contact with reality." (Tr. 382). He denied anxiety, homicidal thoughts and impulses

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning.  American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 48 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *DSM-IV-TR*, at 34.

and said he was not a violent person although he had been in a couple fights. (Tr. 381). He knew the names of the current and recent presidents, the governor, and the mayor. (Tr. 382). He could count backwards from twenty and recite the alphabet, both with no errors. (Tr. 382). "His insight was fair and his judgment poor." (Tr. 382).

At that time, Plaintiff was looking for a place to live. (Tr. 382). He filled out applications but he said, "they hold the eviction against [he and his wife]." (Tr. 382). Concerning daily activity, "[t]hey wake up at 7 a.m., stretch, and get some food with their food stamps." (Tr. 382). "They go to his mom's house and the Salvation Army for a shower and to clean up. He said they spend a lot of time at his mom's house but they can't sleep there." (Tr. 382). He denied alcohol use but said he smoked marijuana every six months or so. (Tr. 382).

Dr. Smith diagnosed borderline intellectual functioning (estimated) and assigned a GAF score of 50 for symptom severity.[2] (Tr. 383). Dr. Smith found Plaintiff was not impaired in his ability to relate to others including fellow workers, supervisors, and the general public in a work situation; mildly impaired in his ability to understand, remember, and follow instructions due to cognitive limitations; not impaired in his ability to maintain attention, concentration, and persistence; not impaired in his mental ability to withstand stress and pressure of day-to-day work activity; and capable of handling funds. (Tr. 383).

On October 16, 2010, state agency psychological expert Marva Dawkins, Ph.D., reviewed the record and found Plaintiff suffered from an organic mental disorder; specifically, borderline intellectual functioning. (Tr. 388-89). Dr. Dawkins found that Plaintiff experienced a mild restriction in his activities of daily living, and moderate difficulties in maintaining social functioning, concentration, persistence, and pace. (Tr. 396). Following her review of the record, Dr. Dawkins opined that Plaintiff retained the residual functional capacity (RFC) to perform and

2. *See*, *supra*, n. 2.

sustain simple, one-to-two-step routine, repetitive tasks in a work setting without strict production quotas (that is, where tasks were flexible and not timed in terms of quantity of production); and that he required no more than minimal contact with coworkers and supervisors, and only brief, superficial contact with the general public. (Tr. 399, 403). Four months later, state agency psychological expert Vicki Warren, Ph.D., reviewed the record and affirmed Dr. Dawkins' evaluation as written. (Tr. 404).

## **ALJ Decision**

On October 26, 2011, the ALJ, after declining to adopt the prior ALJ's findings pursuant to *Drummond*, found Plaintiff had the severe impairments of organic mental disorders (chronic brain syndrome), visual disturbances, and ADHD. (Tr. 23). The ALJ found Plaintiff's impairments did not meet or medically equal a listed impairment, specifically listing 12.02 (organic mental disorders). (Tr. 23). The ALJ then found Plaintiff had the RFC to perform work at all exertional levels but with the following non-exertional limitations:

> The claimant retains the mental capacity to perform and sustain simple, repetitive, and routine tasks in a work setting where there are no strict production quotas (meaning the tasks are flexible and not timed in terms of quality or production). While the claimant can maintain minimal contact with co-workers and supervisors, he can only have brief, superficial contact with the general public. Furthermore, while he has limited depth perception, he can function sufficiently in an ordinary, non-hazardous workplace. He is able to see to safely and frequently read type written print, handle large to small objects, and avoid ordinary hazards while ambulating in an ordinary, non-hazardous work place. Moreover, he must be limited to low-stress work that does not involve arbitration, negotiation, confrontation, or influencing or being responsible for the safety or welfare of others. Finally, he must be limited to work that does not require more than rudimentary reading, math, or more than simple instructions.

(Tr. 24).

7

Based on VE testimony, the ALJ concluded Plaintiff could perform work as a cleaner/housekeeping, laundry worker, and hand packer and thus, Plaintiff was not disabled. (Tr. 27-28).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The

Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform past relevant work?

5.    Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy.  *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ 1) failed to analyze listing 12.05C; 2) inaccurately assessed Plaintiff's RFC by failing to account for "intermittent mental drifting" and omitting reference to IQ scores, GAF scores, homelessness, and losing custody of his children; and 3) relied on "qualified" VE testimony. (Doc. 19, at 1).

*Listing 12.05(C)*

A claimant can demonstrate he is disabled by presenting "medical findings equal in severity to all the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990). To demonstrate listing 12.05, intellectual disability, formerly termed mental retardation, a claimant must establish three factors to satisfy the diagnostic description: 1) subaverage intellectual functioning; 2) onset before age twenty-two; and 3) adaptive-skills limitations. *See Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675 (6th Cir. 2009); *Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868, 872 (6th Cir. 2003). Beyond these three factors, a claimant must also satisfy "any one of the four sets of criteria" in listing 12.05. *See Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001). Pertinent here, 12.05C requires that a claimant have a valid, verbal, performance, or full scale I.Q. of 60 through 70 *and* a physical or other mental impairment imposing an additional and significant work-related limitation of function. 20 C.F.R. Part 404, Subpt. P, § 12.05(C).

There is no "heightened articulation standard" in considering the listing of impairments; rather, the court considers whether substantial evidence supports the ALJ's findings. *Snoke v. Astrue*, 2012 WL 568986, at *6 (S.D. Ohio 2012) (quoting *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)). However, a reviewing court must find an ALJ's decision contains "sufficient analysis to allow for meaningful judicial review of the listing impairment decision." *Snoke*, 2012 WL 568986, at *6; *see also May*, 2011 WL 3490186, at *7 ("In order to conduct a meaningful review, the ALJ's written decision must make sufficiently clear the reasons for his decision."). The court may look to the ALJ's decision in its entirety to justify the ALJ's step-three analysis. *Snoke*, 2012 WL 568986, at *6 (citing *Bledsoe*, 165 F. App'x at 411).

In the instant case, the ALJ found Plaintiff did not meet listing 12.02 (organic mental disorders).[3]  In doing so, the ALJ stated:

> According to the record, the claimant cares for his personal needs, cares for his children, cooks, cleans, watches television, shops, pays bills, handles a checking account, plays basketball and video games, drives a car, goes to the park, and goes to church for free dinners. (Exhibits B7E, B8E, testimony). These activities suggest he does not suffer from more than moderate limitations with his activities of daily living, social functioning, or concentration, persistence, or pace and does not live in a highly supportive living arrangement. Furthermore, the record also fails to document an episode of decompensation. (Exhibit B10F).
>
> Thus, when considering the above, the undersigned finds the claimant's impairments are not severe enough to meet the requirements of Listing 12.02.

(Tr. 23).

Although Plaintiff raised a 12.05C argument in the instant application, the ALJ failed to address or analyze listing 12.05C or the IQ scores as a result of Dr. Wax's examination. (Tr. 99, 104). Indeed, while the ALJ discussed Dr. Wax's opinion, he did not mention the IQ scores or listing 12.05C in his decision.

Troubling here, Plaintiff raises the same 12.05C listing argument he raised in his prior disability application using essentially the same evidence. (Tr. 99, 104). Generally, res judicata would prevent Plaintiff from re-litigating an issue already determined by the Commissioner, and notably unchallenged by Plaintiff in the prior case. Unfortunately, however, the ALJ did not adopt the prior ALJ's findings via *Drummond* based on new evidence of ADHD, which he subsequently found was a severe impairment. While the Court hesitates to remand, it must do so based on the circumstances of this case.

---

3. Organic mental disorder refers to psychological or behavioral abnormalities associated with a dysfunction of the brain. The required level of severity for this impairment requires, among other elements, demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of: 1) disorientation to time or place; 2) memory impairment; 3) perceptual thinking disturbances; 4) change in personality; 5) mood disturbance; 6) emotional lability; 7) loss of measured intellectual ability of at least fifteen IQ points from premorbid levels. 20 C.F.R., pt. 404, sbpt. P, Listing 12.02.

The Commissioner concedes that, generally, failure to analyze 12.05C when the record references IQ scores under 70 warrants remand. *Abbott v. Sullivan*, 905 F.2d 918, 924-25 (6th Cir. 1990). However, the Commissioner contends the procedural posture of this case precludes remand because the prior ALJ "carefully discussed the IQ scores at issue, including a thorough analysis of . . . listing 12.05C." (Doc. 21, at 11 *referring to* Tr. 112-13).

This argument, while alluring, is off-base. First, the ALJ in the prior case did not analyze whether Plaintiff's conditioned IQ score satisfied listing 12.05C; rather he skipped over that portion of the analysis and declined to apply the listing because Plaintiff did not "have an additional physical or other mental impairment to fulfill the second prong of 12.05C." (Tr. 113). Moreover, the ALJ in the instant case specifically declined to adopt the prior ALJ's findings because there was evidence of another severe mental impairment, ADHD. (Tr. 21, 23). Therein lies the rub.[4] Notably, Plaintiff's counsel described this very pickle to the ALJ at the hearing. (Tr. 99).

Nevertheless, the Commissioner cites *Pasco v. Comm'r of Soc. Sec.*, 137 F. App'x 828, 843 (6th Cir. 2005) and argues the ALJ was not required "to evaluate a claimant's symptoms of mental disorder under one mental disorder listing (e.g., 12.02) if evaluation under other listings (e.g., 12.04, 12.05, 12.06) is more appropriate." Essentially, the Commissioner is arguing the ALJ did not have to address listing 12.05C because he addressed another mental disorder listing – 12.02 (organic mental disorders). However, this argument is also not persuasive.

In *Pasco*, the ALJ analyzed a claimant's impairments under 12.04 (affective disorders), 12.05 (mental retardation), and 12.06 (anxiety-related disorders), as opposed to 12.02 (organic mental disorders), a listing the claimant raised before the ALJ. *Pasco*, 137 F. App'x  at 843. The

---

4. WILLIAM SHAKESPEARE, HAMLET act 3, sc. 1, the "Nunnery Scene" (quoted as "Aye, there's the rub.").

Sixth Circuit affirmed because the listings analyzed by the ALJ were "more appropriate" than those raised by the claimant. *Id*. Specifically, because one of the claimant's primary diagnoses was borderline intellectual functioning, which was also found to be a severe impairment, it was more appropriate to evaluate the claimant's impairments under listing 12.05. *Id*. This reasoning is problematic for Plaintiff.

Here, like *Pasco*, it was "more appropriate" for the ALJ to analyze listing 12.05C considering multiple diagnoses of borderline intellectual functioning and IQ scores below 70. Veritably, the Commissioner does not argue, or point to any evidence, as to why it might be "more appropriate" for the ALJ to address listing 12.02 (organic mental disorders). *Pasco*, 137 F. App'x at 843.  In the end, the Commissioner's concession – that remand is required for failure to analyze 12.05C when the record references IQ scores under 70 – is self-defeating. *Abbott*, 905 F.2d at 924-25.

Most important, and what prompts the Court to remand, is the ALJ's failure to analyze listing 12.05C or the IQ scores as described above, despite being raised by Plaintiff. (Tr. 99, 104). Undeniably, the ALJ omitted any reference to Dr. Wax's findings specifically related to Plaintiff's IQ scores or listing 12.05C in his decision. While there is a colorable argument that Plaintiff does not meet or equal listing 12.05C, which the Commissioner accurately spells out, the Court cannot supplant the role of an ALJ. Accordingly, remand is appropriate for the ALJ to provide "sufficient analysis to allow for meaningful judicial review of the listing impairment decision." *Snoke*, 2012 WL 568986, at *6.

**RFC**

Next, Plaintiff argues the ALJ erred by failing to account for "intermittent mental drifting", which Dr. Wax found during the consultive examination. (Doc. 19, at 11; Tr. 361).

13

Plaintiff also argues the ALJ failed to account for "objective" evidence including IQ scores, GAF scores, homelessness, and losing custody of his children as part of the mental RFC assessment. (Doc. 19, at 11-13).

A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. § 416.929. An ALJ must also consider and weigh medical opinions. § 416.927. When a claimant's statements about symptoms are not substantiated by objective medical evidence, the ALJ must make a finding regarding the credibility of the statements based on a consideration of the entire record. Social Security Ruling (SSR) 96-7p, 1996 WL 374186, *1.

<u>Intermittent Mental Drifting</u>

Plaintiff argues the ALJ's restrictions concerning concentration and persistence were inadequate because the ALJ failed to account for "intermittent mental drifting." (Doc. 19, at 11). Specifically, Plaintiff stretches Dr. Wax's "intermittent mental drifting" observation to argue Plaintiff requires limitations for alertness, attention, and safety. (*Id*.). The Commissioner correctly responds that the ALJ's RFC accounted for "intermittent mental drifting" by limiting Plaintiff to simple, routine, repetitive tasks in ordinary, non-hazardous workplaces with no strict production quotas where he could not influence or be responsible for the safety of others or perform work that required more than simple instructions. (Tr. 24). Simply put, the record does not suggest Plaintiff required more restrictions concerning concentration or persistence than already accounted for in the RFC.

Indeed, the record reflects Plaintiff prepared frozen meals, cleaned, washed dishes, mowed the lawn, shopped, played basketball and video games, and attended sporting event. (Tr.

242-45, 250-56, 362-63). He was capable of paying bills, counting change, handling a savings account, and using checks or money orders. (Tr. 244, 253). He was able to read instruction books and car magazines. (Tr. 380). Moreover, Plaintiff "had no trouble driving his car." (Tr. 380). Dr. Smith noted Plaintiff was "alert and in good contact with reality." (Tr. 382). Dr. Smith also found Plaintiff was not impaired with respect to concentration, persistence, or pace. (Tr. 383). All of this evidence belies Plaintiff's claim that he needed further restrictions concerning concentration and persistence.

"Objective" Evidence

Plaintiff also argues the ALJ erred by failing to account for "objective" evidence when determining Plaintiff's RFC. Specifically, IQ scores,[5] GAF scores, a variety of observations by Dr. Wax, Dr. Smith's finding of poor judgment, homelessness, and loss of custody of his children. (Doc. 19, at 11-13). However, contrary to Plaintiff's assertion, the ALJ discussed and weighed every medical opinion in the record. Important here, an ALJ is not required to discuss every piece of medical evidence in the record. *Kornecky v. Comm'r*, 167 F. App'x 496, 507-08 (6th Cir. 2006). Nor is he required to discuss every limitation he adopts, or conversely does not adopt, from a consultive examiner's opinion. *Ford v. Comm'r of Soc. Sec.*, 114 F. App'x 194, 198 (6th Cir. 2004); 20 C.F.R. §§ 416.927, 416.945(a)(1) (while an ALJ must consider medical opinions, the RFC determination is expressly reserved to the Commissioner).

Moreover, as the Commissioner points out, GAF scores are of limited value and do not correlate to an inability to work for purposes of a Social Security determination. *See*, *e.g.*, *Murray v. Comm'r of Soc. Sec.*, 2013 WL 5428734, at *3 n.2 (N.D. Ohio); *Lewis v. Colvin*, 2013

5. With respect to the IQ scores, the Court is remanding for the ALJ to address the scores in conjunction with listing 12.05C; however, as explained in this section, the ALJ was not required to discuss every piece of medical evidence, especially when the ALJ incorporated the prior ALJ's decision, which discussed the IQ scores, to support his RFC.

WL 6145811, at *7 n.1 (S.D.W.V.); *Zavala v. Colvin*, 2013 WL 5954741, at *5 (E.D. Wash.). To be sure, Plaintiff's estimated GAF scores were inconsistent with the evidence. For example, while Dr. Wax assigned a GAF score of 48, his examination revealed Plaintiff was a pleasant, intellectually limited, alert, cooperative man with no mental confusion, good motivation, and no abnormal psychomotor activity. (Tr. 361-62). Similarly, while Dr. Smith assigned a GAF score of 50, he found Plaintiff was alert, in good contact with reality, and at most mildly limited with respect to one category of mental functioning. (Tr. 382-83).

Here, Plaintiff is really attempting to contradict the ALJ's ultimate RFC finding by citing evidence he claims supports his proposition; which requires blind acceptance of Plaintiff's speculative assumptions. For example, Plaintiff's counsel claims Plaintiff had a difficult time during the hearing describing an altercation that took place; however, the Court understood Plaintiff's explanation clearly despite counsel's lengthy inquest. (Tr. 46-58). Moreover, while Plaintiff complains homelessness should have been accounted for in the RFC, he fails to explain why or how. Instead, the record is clear, as the ALJ points out, that Plaintiff was capable of engaging in a plethora of daily activities, managing funds, and driving a vehicle. Indeed, a case worker noted Plaintiff saw "no problem with this way of life." (Tr. 350). With respect to caring for his children, Plaintiff also fails to explain why or how this would affect the ALJ's ultimate RFC. Indeed, Plaintiff lost custody of his kids and was evicted from his home due to hoarding, which Plaintiff admitted he could have avoided if he merely went to court. (Tr. 380). Regardless, Plaintiff claimed he took care of his kids at his mother's house despite not having custody. (Tr. 241-24).

Ultimately, Plaintiff ignores the standard of review. Namely, that "the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence,

supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. In this case, as explained above, substantial evidence supports the ALJ's RFC finding.

### Step Five – VE Testimony

To meet his burden at the step five, the Commissioner must make a finding "'supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Education & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id.* If an ALJ relies on a VE's testimony in response to a hypothetical, that hypothetical must accurately portray the claimant's limitations. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010); *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (explaining that although an ALJ need not list a claimant's medical conditions, the hypothetical should provide the VE with the ALJ's assessment of what the claimant "can and cannot do"). "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

Here, Plaintiff argues the ALJ improperly relied on VE testimony with respect to production quotas, negotiation or confrontation, and the availability of jobs existing in significant numbers in the national economy. (Doc 19, at 13-16). Each argument is addressed in turn.

Production Quotas

Based on the ALJ's hypothetical that restricted strict production quotas, which the ALJ ultimately incorporated into the RFC, the VE identified representative jobs (cleaner/housekeeping, laundry worker, hand packager) which Plaintiff could perform according to the Dictionary of Occupational Titles (DOT). However, Plaintiff argues, based on counsel's questioning at the hearing, that these representative jobs, in fact, do require strict production quotas. (Doc. 19, at 13-14). Simply put, Plaintiff's argument is without merit for the reasons articulated by the Commissioner. (Doc. 21, at 19-21).

Plaintiff's argument relies on testimony his counsel elicited from the VE on cross-examination. With respect to the hand packager job, Plaintiff's counsel asked the VE, "depending on some days or some employers there could be a certain number of items, a certain quota that needed to be produced, right?" (Tr. 88). Which the VE responded, "[t]here could be." (Tr. 88). Plaintiff's counsel proposed similarly speculative questions of possible limitations in certain circumstances with respect to the office cleaner and laundry worker positions; on both occasions the VE delicately agreed there might be "standards" as there are with every job. (Tr. 87-90).

As the Commissioner points out, the Sixth Circuit has rejected a substantively identical argument regarding speculative questions of possible limitations where a VE has already testified as to prototypical occupational requirements consistent with the DOT. *Young v. Apfel*, 40 F. App'x 157, 162-63 (6th Cir. 2002); *see also Henry v. Colvin*, 2013 WL 5353689, at *11 (N.D. Ohio) ("The VE clearly testified that simple jobs generally do not have production quotas or stresses. It is immaterial that the VE could not identify a specific number of jobs that may deviate from that general principle.").

18

Moreover, each of the representative jobs have been found consistent with no production quota or no production-rate pace limitations. *Scott v. Comm'r of Soc. Sec.*, 2011 WL 720198, at *9 (N.D. Ohio) (with respect to "the jobs presented by the VE," including "hand packager" and laundry laborer . . . [t]here is no requirement of any production expectancy affiliated with any of these jobs."); *Masek v. Astrue*, 2010 WL 1050293, at *23-25 (N.D. Ill.) (explaining that while the housekeeper position may have a productivity element in terms of getting the job done within a timely fashion, it does not require specific production rate quotas in terms of completing so many tasks or creating so many products per hour for numerous clients).

Tellingly, Plaintiff fails to support his argument with any legal authority. Accordingly, the VE testimony with respect to production quotas, and the ALJ's reliance of the same, is not in error.

Negotiation or Confrontation

Similarly, Plaintiff argues the representative jobs were inapplicable because the VE affirmed the possibility that "a person can have some negotiation or confrontation with a supervisor over work quality, [or] over scheduling issues". (Tr. 98). As noted above, the ALJ was entitled to rely on VE testimony regarding the functional limitations of the positions identified. *Young*, 40 F. App'x at 162-63. Indeed, despite the VE's response that presumably any job might involve some negotiation or confrontation, the ALJ was legally justified in relying on the VE's testimony as to the prototypical occupational requirements consistent with the DOT. *Id.*

Availability of Jobs Existing in Significant Numbers

Finally, Plaintiff argues the VE erred in utilizing the Occupational Employment Statistics (OES) figures in her analysis regarding the number of positions available for each of the representative jobs. (Tr. 98; Doc. 19, at 15-16).

19

Here, the VE testified that the number of positions available for the identified occupations were derived from OES, which provides estimates for occupations listed by Standard Occupational Classification (SOC) codes. (Tr. 93-94). However, Plaintiff argues the ALJ was not entitled to rely on the VE's data because an OES entry might include multiple DOT occupations. (Tr. 94; Doc. 19, at 15-16). Notably, a district court in the Eastern District of Pennsylvania rejected this exact argument.

> Plaintiff has not pointed to any law or regulations that compel us to call into question the methodology or sources used by the vocational expert. The vocational expert did not testify that the method he used in this case to determine numbers of jobs available is any different than the method used and accepted in any other social security case. That DOT classifications are more specific than the SOC system is not indicative that this method of correlation is unreliable. Based on our independent research, the SOC system is used by federal statistical agencies to classify occupations.

*James v. Astrue*, 2011 WL 7143113, at *25 (E.D. Pa.).

For the same reasons articulated in *James*, this Court finds the VE did not err when determining job numbers employing OES and SOC methodologies. *Id*.

Plaintiff briefly cites *Woodruff v. Astrue* to argue that using OES group statistics instead of estimates for specifically identified DOT occupations is reversible error. 2013 WL 821336, at *11 (N.D. Ohio). However, *Woodruff* is inapposite to the instant case. The court in *Woodruff* did not remand because of the VE's use of OES or other statistics; rather, the court remanded because the ALJ mischaracterized the stated reasons for relying on VE testimony and the VE did not consider Plaintiff's RFC when considering available positions. *Id*.

What is more, Plaintiff does not dispute that significant numbers of jobs exist for the identified DOT occupations, which is all the Commissioner is required to show. 20 CFR § 404.1566(b). Here, the VE identified three occupations with jobs in overwhelming numbers nationally and regionally. (Tr. 83-84) (housekeeper: 2,500 northeast Ohio, 12,000 Ohio, One

million nationally; <u>laundry worker</u>: 600 northeast Ohio, 3,000 Ohio, 75,000 nationally; <u>hand packager</u>: 1,900 northeast Ohio, 9,000 Ohio, 208,000 nationally). The Sixth Circuit has identified "as few as 125 jobs in a local areas to be 'significant'" to satisfy the Act. *See Kyle v. Comm'r of Soc. Sec.*, 2013 WL 5925777, at *5 (S.D. Ohio) (citing *Stewart v. Sullivan*, 904 F.2d 708 (6th Cir. 1990)).

Accordingly, Plaintiff's arguments concerning treatment of the VE's testimony is without merit. Moreover, the VE did not commit reversible error by determining job numbers according to OES and SOC.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds substantial evidence does not support the Commissioner's decision denying DIB only to the extent that the ALJ failed to properly analyze listing 12.05C. Therefore, the Court remands, pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this opinion.

IT IS SO ORDERED.

      s/James R. Knepp, II
United States Magistrate Judge